UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

BRITTANY S. GOBBLE, et al.,          )
                                     )
          Plaintiffs,                )
                                     )
     vs.                             )          **2:22-CV-51**
                                     )
BRISTOL GYNECOLOGY AND               )
OBSTETRICS, P.C., et al.,            )
                                     )
          Defendants.                )


**MEMORANDUM OPINION AND ORDER**

Before the Court is a Motion for Summary Judgment and a Motion for Partial Summary Judgment filed by Defendants Bristol Gynecology and Obstetrics, P.C., David P. Russell, M.D., and Haley L. Akin, M.D. ("Defendants"). [Docs. 84, 88]. Each motion is supported by a brief, referenced documents, and a statement of material facts. [Docs. 85-87, 89-90]. Plaintiffs Brittany S. Gobble and Benjamin T. Gobble, individually and as parent and next friend of their minor child OLG, ("Plaintiffs") filed a response in opposition to each motion, along with supporting briefs, referenced documents, a statement of material facts, and a response to Defendants' statement of material facts. [Doc. 92-98, 104]. Defendants filed a reply and response to Plaintiffs' statement of material facts. [Docs. 99, 100]. Defendants' motions are now ripe for resolution. After careful consideration of the issues raised by Defendants in their filings and for the reasons stated below, Defendants' Motion for Summary Judgment [Doc. 84] is **DENIED**, and Defendants' Motion for Partial Summary Judgment [Doc. 88] is likewise **DENIED**.

1

# I.     FACTUAL BACKGROUND

The dispute in this matter stems from the prenatal care provided in January 2021 to Brittany S. Gobble ("Ms. Gobble") by David P. Russell, M.D. ("Dr. Russell") at Bristol Gynecology and Obstetrics, P.C. ("BGO") and Haley L. Akin, M.D. ("Dr. Akin"). Plaintiffs contend that Defendants failed to properly diagnose and treat Ms. Gobble for severe preeclampsia which developed during her pregnancy and resulted in injuries to her minor child.

Ms. Gobble began prenatal care with Dr. Russell at BGO on June 22, 2020. [Russell Dep. 34:10-20, Doc. 87-8, p. 3]. On January 7, 2021, Ms. Gobble presented to BGO with blood pressure of 143/93 and a 3+ urine dipstick. [Gross Rule 26 Disclosure., Doc. 98-12, p. 3]. Dr. Russell sent Ms. Gobble to Bristol Regional Medical Center ("BRMC") for further evaluation for preeclampsia. *Id.*; [Cawyer Dep. 97:15-20, Doc. 98-2, p. 6]. Preeclampsia is described as "a disorder of pregnancy associated with new-onset hypertension" and "often accompanied by new-onset proteinuria." [Doc. 98-18, p. 1]. Ms. Gobble was not diagnosed with preeclampsia on January 7, 2021. [Gross Rule 26 Disclosure, Doc. 98-12, p. 3]; [Cawyer Dep. 97:15-20, Doc. 98-2, p. 6]. She then visited BGO again on January 11 and 14, 2021, and continued to have proteinuria during those visits but was not diagnosed with preeclampsia on either date. *Id.*

In the afternoon of January 16, 2021, Ms. Gobble presented to BRMC with elevated blood pressure and a headache. [Docs. 91-8, p. 1; 98-14, p. 1]. At that point, Ms. Gobble was 35 weeks pregnant. [Gross Rule 26 Disclosure, Doc. 98-12, p. 5]. Before arriving, Ms. Gobble called the hospital to report that her blood pressure read 166/108 and that she had a throbbing headache which did not resolve with Tylenol. [Docs. 98-13, p. 2; 98-14, p. 1]. She was then admitted overnight for observation. Gobble's blood pressure was taken every five to ten minutes from 4:00 p.m. to 5:30

2

p.m.,[1] at which time the antihypertensive medication labetalol was administered. [Gable Dep. 69:22-25, Doc. 91-7, p. 2]. She was evaluated at the hospital by Dr. Akin, who noted that Ms. Gobble was not resting while her blood pressures were being taken, that she had "no sustained severe range pressures," and that her blood pressures were in a "mild range." [Doc. 98-14, p. 1]. It was further noted that Ms. Gobble was given medication that resolved her headache. *Id.*; [Doc. 98-14, p. 2]. However, Ms. Gobble testified in a deposition that her headache improved but did not fully resolve. [Gobble Dep. 98:6-7, Doc. 98-6, p. 12]. While Ms. Gobble was at the hospital, fetal heartrate monitoring was performed and was reassuring. [Doc. 98-14, p. 1-2]. At 5:46 p.m. that evening, a fetal ultrasound was taken and showed calcification of the placenta and an amniotic fluid index of 6.5, which was noted to be below normal. [Doc. 98-14, p. 3].

Ms. Gobble was discharged from BRMC at 4:22 p.m. on January 17, 2021. [Doc. 91-8, p. 1]. Ms. Gobble was diagnosed with preeclampsia without severe features, and Dr. Akin noted that her preeclampsia labs were within normal limits other than an elevated protein/creatinine ratio. [Doc. 98-14, p. 1-2]. Defendants state that Ms. Gobble had normal blood pressure and no headache at discharge. [Doc. 85, p. 3 (citing Thomas Dep. 55 and Akin Dep. 128)]. However, as referenced above, Ms. Gobble contends that her headache never fully resolved. [Gobble Dep. 98:6-7, Doc. 98-6, p. 12] (explaining that her headache did not go away but did get better).

Before leaving the hospital, Ms. Gobble was given certain discharge instructions. Dr. Akin testified that she advised Ms. Gobble to continue monitoring her blood pressures at home and to immediately return to the hospital if she had a severe range blood pressure reading, headache, change in fetal movement, or contracting. [Akin Dep. 128, Doc. 87-1, p. 9; Akin Dep. 130, Doc.

---

[1] Those readings included the following: 161/104 at 4:00 p.m.; 150/105 at 4:10 p.m.; 167/108 at 4:15 p.m.; 156/111 at 4:20 p.m.; 153/90 at 4:30 p.m.; 149/100 at 4:40 p.m.; 147/97 at 4:45 p.m.; 142/94 at 4:50 p.m.; 165/102 at 5:00 p.m.; 144/96 at 5:10 p.m.; 152/101 at 5:15 p.m.; and 139/94 at 5:30 p.m. [Doc. 98-14, p. 4].

98-3, p. 9]. Ms. Gobble testified in her deposition that she did not remember being told to return to the hospital if she experienced these changes. [Gobble Dep. 94-95, Doc. 98-6, p. 10-11]. Additionally, Ms. Gobble was given written instructions on how to count her baby's kicks and what to do if she did not feel fetal movement. [Bowman Dep. 18, 26:18-23, Doc. 87-2, p. 6, 8]; [Doc. 87-10, p. 9]. Brittany Bowman, RN, a labor and delivery nurse at BRMC who was involved in discharging Ms. Gobble, testified that she also told Ms. Gobble how to monitor kick counts. [Bowman Dep. 18:18-25, Doc. 87-2, p. 6].

Ms. Gobble returned to BGO for follow-up on Monday, January 18, 2021, and was seen by Dr. Russell. Prior to that appointment, Dr. Akin and Dr. Russell discussed Ms. Gobble's weekend hospital visit. [Russell Dep. 64:1-7, Doc. 98-4, p. 5]. Dr. Akin advised that she had diagnosed Ms. Gobble with preeclampsia without severe features. [Akin Dep. 129:8-23, Doc. 98-3, p. 8]. Dr. Russell did not recall Dr. Akin mentioning during that conversation that Ms. Gobble had severe range blood pressures or a headache lasting for twelve hours. [Russell Dep. 64:8-25, Doc. 98-4, p. 5]. During Ms. Gobble's appointment on January 18, a non-stress test was performed to evaluate fetal wellbeing, the results of which were reassuring. [Gross Dep. 96-97, Doc. 87-6, p. 5-6]; [Russell Dep. 76:16-18, Doc. 87-8, p. 4]. However, Ms. Gobble had elevated blood pressure despite taking medication that day and a 3+ urine protein dipstick test. [Gross Rule 26 Disclosure, Doc. 98-12, p. 7]. Dr. Russell indicated that while Ms. Gobble was inducible at that time, he decided to wait another week before inducing her. [Russell Dep. 76:5-15, Doc. 87-8, p. 4]; [Gobble Dep. 134:1-7, Doc. 98-6, p. 14]. According to Ms. Gobble, Dr. Russell advised her during this visit that the baby's movements would begin to slow down because she was in the first stages of labor. [Gobble Dep. 41:2-25, 42:1, Doc. 98-6, p. 5-6]. Ms. Gobble testified that during this visit she told Dr. Russell she felt uncomfortable in a way she had not felt in her previous pregnancy,

and thought she needed to be induced that day. [Gobble Dep. 133:19-25, 134:2-3, Doc. 98-6, p. 13-14]. Nevertheless, she went home and had no communication with Defendants on January 19, 2021, but did experience lower fetal movement than normal that day. [Gobble Dep. 61, Doc. 87-3, p. 7].

On January 20, 2021, Ms. Gobble did not feel fetal movement from 7:00 a.m. onward. [Gobble Dep. 44:10-12, Doc. 98-6, p. 7]; *see also* [Doc. 98-16] (Ms. Gobble's text to her sister that she has not felt OLG move "at all today"). Ultimately, she called BGO at 12:45 p.m. that day, arrived at BRMC at 1:27 p.m., and was admitted to Labor and Delivery at 1:42 p.m. [Docs. 98-13, p. 1; 87-10, p. 12; 91-8, p. 2; 98-16]. Fetal monitoring began at 1:44 p.m., and Dr. Russell delivered OLG at 2:43 p.m. by cesarean section. [Doc. 98-14, p. 5-6]. OLG was born at 35 weeks and 6 days and suffered hypoxic ischemic encephalopathy, a brain injury caused by lack of oxygen to the brain before birth. [Doc. 87-11, p. 7]. OLG will likely experience ongoing developmental delays, abnormal muscle tone, and respiratory difficulties due to her brain injury. [Capal Dep. 60:20-26, 62:1-14, Doc. 98-89, p. 5-6].

## II.     PARTIES' ARGUMENTS

### a.  Motion for Summary Judgment

In their Motion for Summary Judgment, Defendants argue that summary judgment is appropriate because Plaintiffs cannot establish causation. [Doc. 85, p. 5-6]. Specifically, they contend that OLG's injuries were not foreseeable to Defendants when the medical care at issue was provided, noting that OLG's injuries must have been foreseeable for Plaintiffs to establish causation. *Id.* at 8-10. Defendants state that Ms. Gobble did not meet the diagnostic criteria for preeclampsia with severe features and that prenatal testing was normal; thus, they deny that OLG's injuries were connected to Ms. Gobble's preeclampsia. *Id.* at 2. Defendants further argue that for

5

an injury to be foreseeable, it must be probable instead of merely possible, and Defendants must have had some ability to prevent the injury. *Id.* at 8. They argue that additional fetal monitoring after a non-stress test was performed on January 18, 2021, would not have revealed fetal distress, and they could not have foreseen that there would be a lack of fetal movement on January 20, 2021. *Id.* at 11-12. Defendants then assert that Plaintiffs have failed to put forth expert proof showing that OLG's injuries were foreseeable to Defendants. *Id.* Given the requirement that each element of a Tennessee Healthcare Liability Act ("THLA") claim be established through expert testimony, Defendants argue that Plaintiffs' claims must fail. More specifically, Defendants assert that one of Plaintiffs' expert witnesses, Jack P. Ayoub, M.D., is not qualified to testify as an expert. They further state that his testimony fails to prove that OLG's injuries were foreseeable with additional monitoring after January 18, 2021. *Id.* at 11. Defendants also contend that Plaintiffs' other expert witnesses, William Malcolm, M.D. and Gilead A. Gross, M.D., were unable to say that the specific injuries to OLG were foreseeable to Defendants. *Id.* at 11-12. They expound on this argument in their Reply as follows: "[b]oth experts concede that no one can say what caused Plaintiffs' injuries, which is precisely the reason the injury itself was not foreseeable." [Doc. 100, p. 5].

In response to the Motion, Plaintiffs contend that OLG's injuries were foreseeable to Defendants and that Defendants could have prevented the injuries if Ms. Gobble had been diagnosed with severe preeclampsia and hospitalized or, alternatively, if OLG had been delivered on January 17 or 18, 2021. [Doc. 93, p. 2]. Plaintiffs contend that Ms. Gobble reported to Dr. Akin that she had a throbbing headache and high blood pressure on January 16, 2021, indicating she had severe preeclampsia. *Id.* at 5-6. Further, Plaintiffs assert that Ms. Gobble having a headache which improved with medication but did not fully resolve, was another indicator of severe preeclampsia.

*Id.* at 8. Additionally, Plaintiffs point out that Ms. Gobble had a 3+ urine protein reading during her visit with Dr. Russell after being discharged from the hospital. *Id.* at 9. It is Plaintiffs' contention that if Ms. Gobble had not been discharged from the hospital by Dr. Akin or had been placed back in the hospital after her visit with Dr. Russell, Defendants would have discovered fetal distress. Lastly, while not specifically addressed in Defendants' Motion for Summary Judgment, Plaintiffs further assert that OLG should have been delivered instead of Ms. Gobble being discharged from the hospital by Dr. Akin, or OLG should have been delivered by Dr. Russell the next day. *Id.* at 15.

### b. Motion for Partial Summary Judgment

In their Motion for Partial Summary Judgment, Defendants ask the Court to resolve four issues on summary judgment. First, Defendants assert that there is no proof that Dr. Russell committed malpractice related to the care of Ms. Gobble on January 7, 2021, and January 20, 2021. [Doc. 89, p. 6-7]. Next, Defendants assert comparative fault against Ms. Gobble for failing to timely call Dr. Russell when she noticed decreased fetal movement on January 20, 2021. *Id.* at 7-9. Defendants point out that she did not feel fetal movement starting at 7:00 a.m. that day but waited until 12:45 p.m. to call Bristol Gynecology, despite having received instructions to call her doctor or go to the hospital within two hours if she did not feel OLG kick. *Id.* at 8. Defendants state that "[i]t is undisputed that inadequate perfusion of a fetus with oxygenated blood leads to metabolic acidosis, which is an indispensable precursor to permanent neurologic injury." *Id.* As a result, they contend that the delay in going to the hospital allowed ongoing metabolic acidosis, which would have been prevented had Ms. Gobble reported to the hospital sooner. Third, Defendants argue that Ms. Gobble's smoking during her pregnancy was a cause of or contributor to the injuries OLG experienced, and that Defendants had no duty to protect OLG from those

7

injuries. Additionally, Defendants assert that OLG sustained further injury after birth, i.e., additional brain damage as a result of ongoing hypoxia and hypotension, for which Defendants also bear no responsibility. *Id.* at 9. Defendants also assert that there is no way to distinguish between any injuries that OLG suffered leading up to her birth as opposed to those she sustained post-delivery. *Id.* As such, they conclude that they are entitled to partial summary judgment on the claim that Ms. Gobble's smoking caused or contributed to the outcome of the case, as did the post-birth medical treatment that OLG received. *Id.* at 10. Finally, Defendants aver that they are entitled to partial summary judgment on the fact that OLG has a genetic mutation in the FOXRED1 gene that was discovered after her delivery. *Id.* They state that one of Plaintiffs' experts who testified about this mutation could not say what impact, if any, it had on OLG. *Id.* Basically, Defendants say that because Plaintiffs' expert cannot rule out the FOXRED1 gene as a cause of or contributor to OLG's injuries, Defendants should be able to reference it during trial.

In their response, Plaintiffs first state that while no expert opined that the care provided on January 7 and 20, 2021 caused OLG's injuries, they do argue that Dr. Russell should have diagnosed Ms. Gobble with preeclampsia on January 7. [Doc. 96, p. 2]. Additionally, Plaintiffs claim that Dr. Russell should have told her to go back to the hospital on January 18, 2021, and he was apparently unwilling to look at her hospital records generated from Dr. Akin's treatment of her.[2] *Id.* Plaintiffs claim that if Dr. Russell had seen her elevated blood pressure readings from January 16, he would have better managed her care on January 18. *Id.* In response to Defendants' argument regarding Ms. Gobble's response to the lack of fetal movement, Plaintiffs point to Ms. Gobble's deposition testimony where she said she told Dr. Russell on January 18, 2021, that she did not feel right and thought she needed to be induced. [Doc. 96, p. 3]. Nevertheless, she was sent

---

[2] Dr. Russell testified that BRMC's "firewall" makes it very slow and difficult to access a patient's hospital records. [Russell Dep. 43:4-19, Doc. 98-4, p. 4].

home and told to monitor fetal kicks. *Id.* However, Plaintiffs assert that Ms. Gobble counting fetal kicks is not an adequate measure of fetal well-being, and instead she should have been in the hospital where she could be monitored more accurately. *Id.* at 3-4. In sum, Plaintiffs argue that the extent of any negligence on the part of Ms. Gobble is a question for the jury. *Id.* at 3. Next, Plaintiffs state that no expert in the case has opined that smoking caused OLG's injuries or that any medical providers were negligent in OLG's care after birth. *Id.* at 4. They further assert that Dr. Malcom has specifically opined that the additional injuries OLG sustained were simply the natural consequence of the profound birth injury she sustained. *Id.* Lastly, Plaintiffs state that no expert has opined that the FOXRED1 gene had an impact on OLG's injuries. *Id.* at 4-5.

## III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 sets forth the standard governing summary judgment, providing that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it may affect the outcome of the case under the applicable substantive law, and an issue is 'genuine' if the evidence is 'such that a reasonable jury could return a verdict for the nonmoving party.'" *Koshani v. Barton*, 374 F. Supp. 3d 695, 701 (E.D. Tenn. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also Dugger v. American Water Heater Co.*, No. 2:18-CV-00185-SKL, 2020 WL 12862727, at *5 (E.D. Tenn. July 23, 2020) ("A 'genuine' dispute exists with respect to a material fact when the evidence would enable a reasonable jury to find for the non-moving party." (citing *Anderson*, 477 U.S. at 248; *Jones v. Sandusky Cty., Ohio*, 541 F. App'x 653, 659 (6th Cir. 2013); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001))). "Accordingly, summary judgment is appropriate only when a rational trier of fact could not properly find for the nonmoving party."

9

*Duncan v. Anderson Cnty., Tenn.*, No. 3:20-CV-8-TAV-HBG, 2020 WL 7774905, at *1 (E.D. Tenn. Dec. 30, 2020) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989) (observing that "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial") (citation and internal quotation marks omitted)).

"In determining whether a dispute is 'genuine,' the court cannot weigh the evidence or determine the truth of any matter in dispute." *Dugger*, No. 2:18-CV-00185-SKL, 2020 WL 12862727 at *5 (citing *Anderson*, 477 U.S. at 249). Instead, the Court "must view the evidence in the light most favorable to the non-moving party." *Goodman v. J.P. Morgan Inv. Mgmt., Inc.*, 954 F.3d 852, 859 (6th Cir. 2020). The moving party bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Duncan v. Anderson Cnty., Tenn.*, No. 3:20-CV-8-TAV-HBG, 2020 WL 7774905, at *1 (E.D. Tenn. Dec. 30, 2020). Even viewing facts in this deferential light, "[o]nce the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *E. Tennessee Nat. Gas, LLC v. .32 Acres in Jefferson Cty., Tenn.*, No. 3:13-CV-47, 2013 WL 5555044, at *1 (E.D. Tenn. Oct. 7, 2013) (citing *Curtis Through Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn.1991) (citing *Celotex*, 477 U.S. at 317)). The Supreme Court has warned that the "mere existence of a scintilla of evidence" will not be sufficient to overcome a summary judgment motion. *Anderson*, 477 U.S. at 252. Rather, "the non-moving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material, factual dispute." *Dugger*, No. 2:18-CV-00185-SKL, 2020 WL 12862727 at *5 (citing *Celotex*, 477 U.S. at 330 n.2). Stated another way, the non-moving party must demonstrate "there is more than 'some

metaphysical doubt as to material facts.'"  *Goodman v. J.P. Morgan Inv. Mgmt., Inc.*, 954 F.3d 852, 859 (6th Cir. 2020) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In undertaking this analysis, the Court is cognizant that "[t]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Koshani*, 374 F. Supp. 3d at 701–02 (internal citations omitted).

## IV.   LEGAL ANALYSIS

This is a healthcare liability action over which the Court has diversity jurisdiction, and as such the Court applies state substantive law in determining whether to grant summary judgment. *See Lorshbaugh v. Cmty. Heath Sys., Inc.*, No. 3:18-CV-394, 2019 WL 355529, *2 (E.D. Tenn. Jan. 29, 2019). For a plaintiff to successfully assert a malpractice claim under the Tennessee Healthcare Liability Act (THLA), the plaintiff must prove each of the following elements, supported by expert testimony:

> (1) the recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
> (2) that the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with that standard; and
> (3) as a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

*West v. United States*, No. 3:17-CV-00368, 2020 WL 6901608, *2 (M.D. Tenn. Nov. 24, 2020) (citing Tenn. Code Ann. § 29-26-115(a); *Hurst by Hurst v. Dougherty*, 800 S.W.2d 183, 185 (Tenn. Ct. App. 1990)). "This statute codifies the common law elements of negligence—duty, breach of duty, causation, proximate cause, and damages." *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993) (internal citations omitted). The Court will first address whether Plaintiffs have proffered a qualified expert who has offered competent opinions sufficient to support each of the elements of

the THLA claim before more specifically considering whether there is a genuine dispute of material fact as to each of the elements.

### a. Expert Testimony

An expert witness must be *competent* pursuant to Tenn. Code Ann. § 29-26-115(b) and *qualified* pursuant to Fed. R. Civ. P. 702. Ultimately, this means the Court must find that the expert witness satisfies both the Tennessee locality rule and Rule 702 of the Federal Rules of Civil Procedure. Those standards are as follows:

(1) The locality rule requires finding the proposed expert:
   a. was licensed to practice in [Tennessee] or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and
   b. had practiced this profession or specialty in one of these states during the year preceding the date that the alleged injury or wrongful act occurred
(2) Rule 702 requires finding:
   a. The proposed expert is qualified by "knowledge, skill, experience, training, or education";
   b. The testimony is relevant, meaning it "will assist the trier of fact to understand the evidence or to determine a fact in issue"; and
   c. The testimony is reliable.

Tenn. Code Ann. § 29-26-115(b); *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008).

In this case, Gilead A. Gross, M.D., William Malcolm, M.D., and Jack P. Ayoub, M.D. have been disclosed as experts on behalf of Plaintiffs and have opined that the Defendants negligently handled Ms. Gobble's prenatal care. Defendants have moved to exclude the testimony of Dr. Ayoub [Doc. 91] and the Court will address that request through a separate order ruling on that *Daubert* motion. Defendants have not moved to exclude the testimony of Dr. Gross or Dr. Malcolm, and the time to do so has now passed. The record shows that Dr. Gross was licensed to practice medicine in the state of Missouri and Dr. Malcolm was licensed to practice in North Carolina during the one-year period immediately preceding the date of the alleged injury in this

12

case, i.e., January 20, 2021. [Gross Rule 26 Disclosure, Doc. 98-12, p. 1]; [Malcolm Dep. 23:10-16, Doc. 87-7, p. 2]. As both Missouri and North Carolina border Tennessee and Dr. Gross and Dr. Malcolm have practiced medicine in their respective states during the year preceding the date of the alleged injury, the Court finds that they have satisfied the locality rule's requirements.

Furthermore, Dr. Gross reported that he is a professor of Obstetrics, Gynecology and Women's' Health at Saint Louis University in St. Louis, Missouri, the Division Chief of maternal fetal medicine, and is certified by the American Board of Obstetricians and Gynecologists to practice obstetrics, gynecology, and maternal fetal medicine. [Gross Rule 26 Disclosure, Doc. 98-12, p. 1]. He has further advised that his practice "includes routinely managing high risk pregnancies," including managing preeclampsia and preeclampsia with severe features. *Id.* at 2. Dr. Malcolm testified that he has worked at Duke's Division of Neonatology for 23 years and acts as the Director of the NICO graduate program, with 75% of his work being clinical. [Malcolm Dep. 23:14-21, Doc. 87-7, p. 2]. Given this information and without challenge from Defendants, the Court will assume for the purposes of addressing Defendants' Motions that Drs. Gross and Malcolm are qualified to provide expert opinions in this matter under Rule 702. The Court will now consider whether summary judgment is appropriate as to Plaintiffs' THLA claim and whether partial summary judgment is appropriate as to the additional issues outlined in Defendants' motion.

### b. Motion for Summary Judgement

#### i. Standard of care

The first element of a THLA claim that Plaintiffs must establish is "the recognized standard of acceptable professional practice in the profession and the specialty thereof" where the defendant practices or in a similar area during the time of the alleged injury. Tenn. Code Ann. § 29-26-115(a)(1). The standard of acceptable professional practice is not merely what a majority of doctors

13

would do under similar circumstances. *Griffith v. Goryl*, 403 S.W.3d 198, 210-211 (Tenn. Ct. App. 2012). A competent expert must also testify to his or her knowledge of the standard of care for the relevant specialty in the relevant community during the relevant timeframe. *Id.*

In addressing the standard of care in this case, Dr. Gross has referenced guidelines established by the American College of Obstetricians and Gynecologists ("ACOG") as to the diagnosis and treatment of preeclampsia and preeclampsia with severe features. [Doc. 98-11]. The ACOG publishes practice bulletins which offer clinical guidance as to the management of various conditions. ACOG practice bulletins are used as guidance for hospitals and clinics across the country, including BGO and BRMC. [Russell Dep. 24:7-10, Doc. 98-4, p. 3; Akin Dep. 36:1-11, Doc. 98-3, p. 3]. Specifically, ACOG Practice Bulletin 222 provides guidelines for diagnosis and management of gestational hypertension and preeclampsia. [Doc. 98-18]. Dr. Russell and Dr. Akin both testified in their depositions that BGO and BRMC did not have specific policies or procedures in place for management of care but that physicians were expected to comply with ACOG guidelines. [Russell Dep. 24:2-10, Doc. 98-4, p. 3; Akin Dep. 36:1-11, Doc. 98-3, p. 3]. Each doctor further stated that ACOG guidelines reflect the standard of care. *Id.* As such, given that Dr. Gross has discussed ACOG guidelines as setting the standard of care and both Dr. Russell and Dr. Akin have concurred with that assessment, the Court finds that Plaintiffs have established the first element of a THLA claim. More specifically, that ACOG Practice Bulletin 222 provides the standard of care for diagnosis and management of preeclampsia.

      ii.  <u>Breach of standard of care</u>

The second element of a THLA claim Plaintiffs must show is that Defendants "acted with less than or failed to act with ordinary and reasonable care in accordance with" the standard of care. Tenn. Code Ann. § 29-11-115(a)(2). As discussed above, ACOG Practice Bulletin 222

provides the standard of care for treating preeclampsia. [Doc. 98-18]. According to the ACOG, the diagnostic criteria for preeclampsia include elevated blood pressure and proteinuria. *Id.* at 2. Proteinuria is defined as 300 mg or more of protein in the urine in a 24-hour collection period, a protein/creatinine ratio of 0.3, or a dipstick reading of 2+ if other methods are unavailable. *Id.* In the absence of proteinuria, preeclampsia can be diagnosed with the new onset of thrombocytopenia, renal insufficiency, impaired liver function, pulmonary edema, or headache unresponsive to medication. *Id.* Preeclampsia with severe features can be diagnosed if the patient has the following:

(1) systolic blood pressure of 160 mmhg or more and/or diastolic blood pressure of 110 mmhg or more on two occasions at least four hours apart (unless antihypertensive therapy is initiated beforehand),
(2) thrombocytopenia,
(3) impaired liver function indicated by liver enzymes or right upper quadrant or epigastric pain,
(4) renal insufficiency,
(5) pulmonary edema,
(6) a new onset headache unresponsive to medication, or
(7) visual disturbances.

*Id.* at 3. The bulletin explains that a patient's report of headache alone is an unreliable and nonspecific diagnostic criterion for severe preeclampsia, and thus "an astute and circumspect diagnostic approach is required when other corroborating signs and symptoms indicative of severe preeclampsia are missing." *Id.* at 2. Additionally, the bulletin states that use of a urine protein dipstick to measure liver function has high false-positive and false-negative results, with a 3+ proteinuria reading being a false-positive in 7% of cases. *Id.* at 3. As such, the bulletin states that a dipstick reading can be substituted "[w]hen quantitative methods are not available or rapid decisions are required." *Id.* If a patient is confirmed to have preeclampsia with severe features, the ACOG provides that delivery is recommended at 34 weeks, but for those without severe features, delivery is recommended at 37 weeks. [Whitten Dep. 55:12-25, 56:1-7, Doc. 98-1, p. 12-13]; [Akin

15

Dep. 52:14-20, Doc. 98-3, p. 5]. The standard of care further dictates that a patient with severe preeclampsia should be hospitalized for evaluation. [Whitten Dep. 69:3-8, Doc. 98-1, p. 18].

In this case, Defendants contend that Ms. Gobble did not show signs of preeclampsia with severe features and thus was treated properly for preeclampsia by Drs. Akin and Russell. On the other hand, Plaintiffs' expert Dr. Gross has opined that Drs. Akin and Russell failed to act in accordance with the standard of care by failing to diagnose Ms. Gobble with severe preeclampsia and by not treating her in accordance with that diagnosis. Regarding Dr. Akin's treatment of Ms. Gobble, Dr. Gross opined that Ms. Gobble showed signs of severe preeclampsia during her hospital visit on January 16 and 17, 2021. [Gross Rule 26 Disclosure, Doc. 98-12, p. 5]. Dr Gross points to Ms. Gobble's unresolved headache, protein/creatinine ratio, and blood pressure readings as signs of severe preeclampsia. *Id.* Ms. Gobble's blood pressure was 166/108 at 3:05 p.m., 161/104 at 4:00 p.m., 167/108 at 4:15 p.m., 156/111 at 4:20 p.m., and 165/102 at 5:00 p.m. [Docs. 98-13, p. 2; 98-14, p. 4]. Those exceed the 160 systolic and 110 diastolic blood pressures referenced in the ACOG practice bulletin as being diagnostic of severe preeclampsia, but they were not taken four hours apart, and Ms. Gobble had lower blood pressure readings throughout that timeframe as well. However, Ms. Gobble was administered labetalol before the four-hour mark and although her blood pressure eventually lowered as a result, Dr. Gross states that the administration of labetalol did not affect the underlying preeclampsia but instead rendered her blood pressure an unreliable diagnostic criterion. *Id.* at 6. Dr. Gross then discussed Ms. Gobble's low amniotic fluid index, which he stated showed compromised placental function. *Id.* at 5. Given this information, Dr. Gross opined that Dr. Akin should have delivered OLG during that hospital visit, or Ms. Gobble should have remained at the hospital instead of being discharged on January 17, 2021. *Id.* at 7; [Gross Dep. 96, Doc. 87-6, p. 5]. Dr. Malcolm also testified about the fetal ultrasound that was

performed at BRMC on January 17 when Ms. Gobble was 35 weeks pregnant. [Malcolm Dep. 151:16-17, Doc. 98-10, p. 6]. He pointed out that the ultrasound revealed calcifications which are not typical at 35 weeks of pregnancy and should have raised concerns about placental insufficiency. [Malcolm Dep. 153:12-16, Doc. 98-10, p. 6].

At that same time, there is also evidence in the record disputing that Ms. Gobble had preeclampsia with severe features. For example, Ms. Gobble's headache may have in fact fully resolved while she was at BRMC. [Thomas Dep. 55:18-19, Doc. 87-4, p. 2] (testimony that Ms. Gobble reported her headache had gone down to a 1 and was almost completely gone on January 17). Additionally, Ms. Gobble's blood pressure had begun to lower before and after administration of labetalol, which resulted in Dr. Akin describing them as "mild range." [Doc. 98-14, p. 1]. Further, while Dr. Akin noted that Ms. Gobble's protein/creatinine ratio was elevated, she also noted that the preeclampsia labs were within normal limits. *Id.*

The Court finds that, despite Defendants providing countervailing evidence, Plaintiffs have placed sufficient facts and expert testimony in evidence to demonstrate that there is a genuine issue of material fact as to whether Ms. Gobble should have been diagnosed with preeclampsia with severe features. The question then becomes whether Plaintiffs have provided competent expert testimony to demonstrate that, if Ms. Gobble should have been diagnosed with severe preeclampsia, Dr. Akin failed to follow the standard of care in treating her. If Ms. Gobble had severe preeclampsia as Dr. Gross opines, then the standard of care would have required Dr. Akin to deliver OLG or to keep Ms. Gobble in the hospital for further observation. Because Dr. Akin did not do either of those things, the Court must find that there is a genuine issue of material fact as to the second element of a THLA claim, that being whether Dr. Akin breached the standard of care in her treatment of Ms. Gobble on January 16 and 17, 2021.

Next, regarding Dr. Russell's treatment of Ms. Gobble, Dr. Gross opined that Dr. Russell also should have recognized that Ms. Gobble was experiencing preeclampsia with severe features. [Gross Rule 26 Disclosure, Doc. 98-12, p. 8]. Dr. Gross states that Dr. Russell should have been able to view medical records from Ms. Gobble's visit to BRMC prior to her office visit on January 18, 2021. *Id.* However, he further opined that even without viewing those records, Dr. Russell should have recognized the severity of Ms. Gobble's preeclampsia given her urine protein reading of 3+ on dipstick and high blood pressure on January 18. *Id.* at 7-8. On the other hand, Dr. Russell testified that it would have been incredibly difficult to access the medical records from BRMC prior to the January 18 visit. [Russell Dep. 43:10-14, Doc. 98-4, p. 4]. Additionally, Dr. Whitten, one of Defendants' expert witnesses, contends that a urine dipstick test at a clinic is not as reliable as a urinalysis at the hospital. [Whitten Dep. 91:10-12, Doc. 98-1]. The information contained in ACOG Practice Bulletin 222 supports this statement by Dr. Whitten. [Doc. 98-18, p. 3]. Thus, Ms. Gobble's 3+ urine protein reading may have been insufficient for Dr. Russell to use as a basis for a severe preeclampsia diagnosis at that time. However, the Court again notes that both sides have developed differing theories supported by competent expert proof. In doing so, Plaintiffs have demonstrated that there is a genuine issue of material fact as to whether Dr. Russell breached the standard of care in failing to diagnose Ms. Gobble with severe preeclampsia on January 18, 2021, and also in failing to treat her in accordance with the protocol applicable to that diagnosis.

iii. <u>Proximate cause</u>

The final element of a THLA claim that Plaintiffs must establish is that OLG suffered injuries which otherwise would not have occurred "[a]s a proximate result of the defendant's negligent act or omission." Tenn. Code Ann. § 29-26-115(a)(3). This element ultimately requires that a plaintiff show the defendant's conduct was the but-for cause of the plaintiff's injuries and

that legal liability should be imposed (proximate cause). *Kilpatrick*, 868 S.W.2d at 598. A plaintiff must show the defendant's negligence "more likely than not" caused the relevant injuries, and a mere possibility is not enough. *Id.* at 602 (quoting *Boburka v. Adcock*, 979 F.2d 429 (6th Cir. 1992)). This element must be established through competent expert testimony. *Hurst by Hurst*, 800 S.W.2d at 185.

Here, the crux of Defendants' argument for summary judgment is that OLG's injuries were not foreseeable to Dr. Akin or Dr. Russell during their treatment of Ms. Gobble, and they contend that the absence of foreseeability negates causation. Under the Tennessee common law, persons have a duty to exercise reasonable care in preventing foreseeable risks of harm to others. *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 355 (Tenn. 2008). In the context of a healthcare liability action, a physician's duty arises from the professional relationship between the physician and patient. *Church v. Perales*, 39 S.W.3d 149, 164 (Tenn. Ct. App. 2000). Foreseeability is an important requirement for a negligence claim. "This factor is so important that if an injury could not have been reasonably foreseen, a duty does not arise even if causation-in-fact has been established." *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 366 (Tenn. 2008) (citing *Doe v. Linder Constr. Co.*, 845 S.W.2d 173, 178 (Tenn. 1992)). Foreseeability is also a relevant consideration in finding proximate cause, because if an injury "could not have been reasonably foreseen, there is no proximate cause." *Kim v. State*, 622 S.W.3d 753, 760 (Tenn. Ct. App. 2020) (quoting *King v. Anderson Cnty.*, 419 S.W.3d 232, 248 (Tenn. 2013)). At the same time, courts balance the "foreseeability of the risk and the gravity of the harm" such that the greater the risk of injury, the less degree of foreseeability is required. *Satterfield*, 266 S.W.3d at 365.

As described above, Ms. Gobble was diagnosed with preeclampsia without severe features and Dr. Gross opined that she should have been diagnosed with preeclampsia with severe features.

19

Dr. Gross advised that a "well-known risk" of severe preeclampsia is placental insufficiency which can lead to fetal hypoxic injury. [Gross Rule 26 Disclosure, Doc. 98-12, p. 5-6]. Placental insufficiency can occur when there is insufficient blood flow to the baby, or the placenta is otherwise functioning improperly. [Cawyer Dep., 98:10-20, 99:1-11, Doc. 98-2, p. 7-8; Akin Dep. 48:9-21, Doc. 98-3, p. 4]. Obstetricians can use various testing methods in a hospital to determine if placental insufficiency is occurring. [Gross Rule 26 Disclosure, Doc. 98-12, p. 7]. Thus, Dr. Gross opined that if Ms. Gobble had been kept in the hospital on January 17 or told to return on January 18, 2021, "the deterioration in fetal condition would have been identified earlier," and OLG's brain injury would have been prevented. *Id.* at 6-7. Dr. Malcolm further testified as to the timing of OLG's brain injury. He described it as a "partial, prolonged sort of injury." [Malcolm Dep. 117:17-18, Doc. 98-10, p. 4]. He opined that OLG began experiencing metabolic acidosis in the day or two leading up to her delivery. [Malcolm Dep. 116:3-18, Doc. 98-10, p. 4]. More specifically, he testified that OLG's brain injury began "a day or two leading up until 48 hours" and then an acute injury occurred "within 24 hours of delivery." [Malcolm Dep. 118:3-6, Doc. 98-10, p. 5]. Dr. Gross agreed that the injury "was evolving 24 to 48 hours prior" to delivery. [Gross Dep. 79:1-15, Doc. 100-1, p. 2].

Taking these opinions together, it is Plaintiffs' proposition that if Ms. Gobble had been hospitalized between January 16 and 18, 2021 or if OLG had been delivered during that timeframe, the injuries that began to occur in the period 24-48 hours prior to her actual delivery would have been prevented. In their Motion, Defendants assert that no expert could say what caused OLG's injuries or when they occurred. It is true that no expert could provide a narrower timeframe of when OLG's occurred, but they did opine that the injury was caused by Ms. Gobble's severe preeclampsia and the treatment Defendants provided/failed to provide to her. [Gross Rule 26

Disclosure, Doc. 98-12, p. 8] ("Had Dr. Russell and/or Dr. Akin complied with the standard of care, OLG would have avoided the hypoxic encephalopathy."); [Malcolm Dep. 86:16-23, Doc. 87-7, p. 5] (explaining that it is more probable than not that preeclampsia was a contributing factor to OLG's metabolic acidosis).

Defendants further argue that OLG's injuries could not have been foreseeable because fetal testing, including fetal heart monitoring on January 16 and 17, 2021 and a non-stress test on January 18, 2021, was reassuring. However, Plaintiffs' experts have opined that other factors rendered the injury foreseeable to Defendants. [Gross Dep. 157:1-6, Doc. 98-5, p. 6] ("you use all the clues, but the major hallmark of… severe [preeclampsia] here was the -- were the blood pressures [and headache]"); [Gross Dep. 98:3-21, Doc. 87-6, p. 7] (stating that the non-stress test would be reassuring "[i]n and of itself without the knowledge that there's severe preeclampsia going on, but… we don't practice like that"); [Malcolm Dep. 151:11-17, 152:10-15, Doc. 98-10, p. 6] (explaining that calcifications on ultrasound should have raised concerns on January 17).

When addressing a motion for summary judgment, the Court must view the evidence in the light most favorable to Plaintiffs. Plaintiffs must offer competent expert proof that Defendants' conduct "more likely than not" caused the relevant injuries. In reviewing the evidence provided, the Court finds that Plaintiffs' experts have opined that if Defendants had properly diagnosed Ms. Gobble with severe preeclampsia and treated her in accordance with that diagnosis, OLG's injuries would have been prevented. This type of causation testimony has survived summary judgment in healthcare liability actions. *See Jennings v. Case*, 10 S.W.3d 625, 631 (Tenn. Ct. App. 1999) ("Plaintiff has provided expert testimony to the effect that the failure of Dr. Case to provide information about Mrs. Jennings's signs and symptoms was a cause of the failure to timely and accurately diagnose and, therefore, a cause of the injuries suffered by Plaintiff."). Moreover, the

Court notes that generally "[p]roximate cause is an issue of fact to be determined by the fact-finder." *Kim*, 622 S.W.3d at 760 (citing *McClung v. Delta Square Ltd. P'ship*, 937 S.W.2d 891, 905 (Tenn. 1996)). Given the testimony and opinions offered by Drs. Gross and Malcolm, the Court must find that there remains a question of fact as to whether Defendants' prenatal treatment of Ms. Gobble proximately caused OLG's injuries. As such, Defendants' Motion for Summary Judgment [Doc. 84] is **DENIED**.

### c. Motion for Partial Summary Judgment

In their Motion for Partial Summary Judgment, Defendants assert they are entitled to judgment as a matter of law on four separate issues. They contend that resolving these issues on summary judgment aids in narrowing the issues for trial. The Court will address each in turn.

#### i. Dr. Russell's actions on January 7 and 20, 2021

Defendants first assert that Plaintiffs do not have competent expert proof that Dr. Russell was negligent in his treatment of Ms. Gobble on January 7 or 20, 2021. Plaintiffs do not dispute that there is no expert testimony that the care provided by Dr. Russell on those dates caused or contributed to OLG's injuries. However, Plaintiffs contend that facts about Dr. Russell's treatment on those dates are relevant to their case in illustrating his failure to later recognize the severity of Ms. Gobble's preeclampsia.

Because Plaintiffs have not asserted that Dr. Russell breached the standard of care on these two dates, Defendants' request for summary judgment on this issue is **DENIED as moot**. At the same time, the Court finds that facts related to those dates may be relevant to Plaintiffs' claims and admissible at trial. The record shows that Ms. Gobble had signs of preeclampsia as early as January 7, 2021, and January 20, 2021 is the date when Dr. Russell delivered OLG. Thus, to the extent Defendants are seeking to bar any reference at trial to the treatment Dr. Russell provided to

22

Ms. Gobble on those dates, the Court **DENIES** that request. Nothing in this ruling will prohibit Defendants from objecting at trial to any proof offered regarding Dr. Russell's actions on January 7 and 20, 2021 which they believe is inadmissible.

        ii.  <u>Ms. Gobble's response to decreased fetal movement</u>

Defendants assert comparative fault against Ms. Gobble for failing to timely respond to the lack of fetal movement she experienced on January 20, 2021. Defendants state that Ms. Gobble was given clear written instructions on how to count for kicks when she was discharged from BRMC on January 17, 2021, and was instructed to return to the hospital or call her doctor if she noticed decreased fetal movement. Ms. Bowman testified that she would have provided written instructions to Ms. Gobble on how to count for kicks. [Bowman Dep. 15:19-25, Doc. 87-2, p. 4]. Those instructions would have directed Ms. Gobble to feel for ten movements in an hour, and if she did not feel ten movements she should eat or drink something and then count again in the next hour. [Doc. 87-10, p. 9]. Defendants state that on January 20, 2021, Ms. Gobble did not feel any fetal movement from 7:00 a.m. onward but did not call BGO to report the lack of movement until 12:45 p.m. Defendants note that Ms. Gobble was in text communication with her sister throughout the morning, and that her sister advised Ms. Gobble to call her doctor. Ultimately, Ms. Gobble arrived at BRMC at 1:27 p.m. and was admitted at 1:42 p.m. In further support of their assertions regarding comparative fault, Defendants point to Dr. Malcolm's testimony that OLG was experiencing metabolic acidosis the morning of January 20, 2021. [Malcolm Dep. 85-86, Doc. 87-7, p. 4-5]. Given that Ms. Gobble waited five hours and forty-five minutes to call BGO after not feeling fetal movement and almost seven hours after not feeling fetal movement before arriving at the hospital, Defendants assert that Ms. Gobble is responsible for OLG's injuries, and they are entitled to partial summary judgment on their comparative fault claim against her.

In response, Plaintiffs state that Dr. Russell told Ms. Gobble that fetal movements would decrease after her visit on January 17, 2021, because she was in the early stages of labor. Further, they state that counting kicks is "a rudimentary and insensitive measure of fetal well-being" and that Ms. Gobble should not have been expected to recognize the absence of kicks. Additionally, Plaintiffs point to Dr. Malcolm's testimony where he opined that OLG's injuries began 24-48 hours prior to her birth, meaning OLG's condition likely began to deteriorate on January 18 and then likely worsened just prior to her birth on January 20. As such, they state that any negligence on Ms. Gobble's part is a question for the jury.

Through factual testimony, the parties have demonstrated that there is a genuine issue of material fact regarding what instructions Ms. Gobble received when she was discharged from BRMC on January 17, 2021. While Defendants have provided a copy of the written instructions on kick counts that she would have received, neither Ms. Gobble nor Ms. Bowman could remember having any in-person conversation where Ms. Gobble was advised on her discharge instructions. [Bowman Dep. 17:8-11, Doc. 87-2, p. 5; Gobble Dep. 95:3-9, Doc. 98-6, p. 11]. Even the written instructions do not provide a specific timeline of when a patient would need to return to the hospital. The instructions merely state that if the patient does not feel 10 kicks in one hour, the patient should wait and try counting again in the next hour and should seek medical care if the patient "noticed that [the] baby has stopped moving or is moving much less than normal." [Doc. 87-10, p. 9]. The Court further observes that given that Ms. Gobble says Dr. Russell told her there would be decreased fetal movement after her visit with him, a jury could find that a reasonable person in Ms. Gobble's shoes might not have initially thought there was a problem with OLG during the morning of January 20. While Defendants have offered factual and expert testimony to suggest that Ms. Gobble had been advised to call BGO or return to BRMC when experiencing the

decreased fetal movement that she did on the morning of January 20, Plaintiffs have provided sufficient countervailing proof from which a reasonable jury could determine that it was not reasonable for her to understand the need to call BGO or to return to BRMC during that timeframe. Because there is a genuine issue of material fact as to whether Ms. Gobble was negligent in her response to the lack of fetal movement she experienced on January 20, 2021, and if so, to what extent, Defendant's Motion for Partial Summary Judgment as to Ms. Gobble's negligence is **DENIED**.

### iii. Ms. Gobble's smoking and OLG's post-birth injuries

Defendants next assert comparative fault against Ms. Gobble for smoking during her pregnancy, which Defendants contend can inhibit fetal growth.[3] They further contend that OLG experienced additional injury after birth and that "Plaintiffs cannot distinguish injury at birth, from injury that occurred after birth." Ultimately, Defendants allege that they are entitled to partial summary judgment on the claim that Ms. Gobble's smoking caused or contributed to OLG's injuries. They further allege that there is no way to distinguish between any injury sustained by OLG as of the time of her birth and the additional brain damage she suffered post-birth due to ongoing hypoxia and hypotension.

Plaintiffs do not dispute that Ms. Gobble smoked while pregnant with OLG, but they contend that her smoking did not affect the outcome of her pregnancy.  In considering Defendants' request for partial summary judgment regarding Ms. Gobble's smoking, the Court finds that Defendants have pointed to no competent proof in the record to support their assertion that Ms. Gobble's smoking caused or contributed to OLG's injuries. Plaintiffs' experts have opined that

---

[3] Plaintiffs have filed a Motion in Limine seeking to bar Defendants from referencing during trial Ms. Gobble's smoking. [Doc. 11, p. 9]. That Motion will be addressed separately.

smoking did not cause OLG's injuries. More specifically, both Dr. Gross and Dr. Ayoub[4] stated that Ms. Gobble's smoking had nothing to do with the outcome in this case. [Gross Rule 26 Disclosure, Doc. 98-12, p. 8]; [Ayoub Dep. 268:7-10, Doc. 87-9]. Further, Dr. Malcolm advised that he did not think smoking affected OLG's injuries, because OLG was developing well until signs of preeclampsia became present. [Malcolm Dep. 162-63, Doc. 98-10, p. 7]. Defendants' expert, Dr. Capal, testified that smoking is generally harmful during pregnancy, but was unable to pinpoint any specific injury caused by smoking in this case stating only that it was "*possible* that smoking *may* have been an additional factor in fetal distress." [Capal Dep. 46:7-10, Doc. 98-9, p. 3] (emphasis added). The mere possibility that Ms. Gobble's smoking could have been an additional factor in OLG experiencing fetal distress is insufficient to find via summary judgment that she caused or contributed to OLG's injuries. *Miller v. Choo Choo Partners, L.P.*, 73 S.W.3d 897, 901 (Tenn. Ct. App. 2001) (requiring "a reasonable basis for the conclusion that it is more likely than not that the conduct… was a cause in fact of the result. A mere possibility of such causation is not enough…[.]") Given the lack of proof in the record which links Ms. Gobble's smoking to OLG's injuries, the Court finds that Defendants have not demonstrated entitlement to a finding as a matter of law that Ms. Gobble's smoking caused or contributed to the outcome of her pregnancy.

As noted above, Defendants further assert that due to OLG going into cardiac arrest and experiencing ongoing hypoxia and hypotension, OLG continued to sustain brain damage post-birth based upon the imaging studies performed of her brain, and as a result that it would be impossible to distinguish between the injuries that OLG had sustained as of the time of her birth versus the

---

[4] The Court references Dr. Ayoub's testimony here because Plaintiffs have cited his testimony in their response to this issue. However, even if the Court ultimately determined that Dr. Ayoub's testimony should be excluded, the statements of Dr. Gross, Dr. Malcolm, and Dr. Capal that smoking did not cause a specific injury in this case would be sufficient to deny Defendants' motion for partial summary judgment on this issue.

full range of injuries she ultimately sustained. In responding to these allegations, Plaintiffs state that no expert has opined that OLG sustained any additional post-birth injury due to the negligence of her treating providers. They point out that Dr. Malcom has specifically opined that the additional injuries OLG sustained were simply the natural consequence of the profound injury she sustained at the time of her birth. [Malcolm Dep. 179:22-180:15, Doc. 98-10, p. 8]. Although, the Court finds that Dr. Malcom does not make his statement in quite as direct a manner as suggested by Plaintiffs, his statements are still sufficiently definitive to demonstrate that Defendants are not entitled to partial summary on this issue. This is especially true given that there is no allegation that any provider was negligent in treating OLG following her birth. Accordingly, Defendant's Motion for Partial Summary Judgment as to Ms. Gobble's smoking and an inability to distinguish between pre and post-birth injuries sustained by OLG is **DENIED**.

    iv.  <u>OLG's FOXRED1 gene</u>

       Finally, Defendants assert that they are entitled to partial summary judgment related to OLG having a genetic mutation in the FOXRED1 gene.[5] While Plaintiffs do not dispute that OLG has a genetic mutation in the FOXRED1 gene, they assert that no expert could testify as to what role, if any, the mutation played in OLG's injuries. In terms of the proof of record on the issue, one of Plaintiffs' experts stated that he could not rule in or out whether the mutation might have had some effect on OLG's injuries. On the other hand, while Dr. Malcolm and Dr. Capal could not say with certainty whether the mutation caused any injuries to OLG, they stated that they thought it did not. [Malcolm Dep. 135:8-10, Doc. 87-7, p. 12; Capal Dep. 15:16-21, Doc. 98-9, p. 2]. Additionally, none of Defendants' experts have opined that this genetic mutation was a cause of, or contributed to, OLG's injuries.

---

[5] Plaintiffs have filed a Motion in Limine seeking to bar Defendants from referencing this genetic mutation at trial. [Doc. 111, p. 18]. That Motion will be addressed separately.

It is unclear what specific relief Defendant are seeking in requesting partial summary judgment as to the genetic abnormality. The issue of whether OLG had the genetic abnormality at issue is undisputed. At the same time, the parties dispute whether information about this genetic abnormality is admissible. Plaintiffs have filed a Motion in Limine [Doc. 111] in which they request that Defendants not be permitted to offer evidence at trial regarding this genetic abnormality. That issue will be addressed in the Court's order ruling on Plaintiff's motion.

On the other hand, if Defendants are asking the Court to find as a matter of law that OLG's genetic mutation was a cause-in-fact or a contributor to OLG's injuries, the Court **DENIES** that request for partial summary judgment because there is no proof in the record which demonstrates that this genetic mutation caused or impacted OLG's injuries. Defendants would need to show more than a mere possibility that OLG's genetic mutation impacted her injuries. *See Chambliss v. Stohler*, 124 S.W.3d 116 (Tenn. Ct. App. 2003) (holding that to support a motion for summary judgment, the moving party must "*conclusively* establish an affirmative defense.") (emphasis added). Accordingly, Defendant's Motion for Partial Summary Judgment as to the issue of OLG's pathogenic genetic variant is **DENIED**.

## V. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment [Doc. 84] is **DENIED**, and Defendants' Motion for Partial Summary Judgment [Doc. 88] is likewise **DENIED**.

SO ORDERED:

/s/Cynthia Richardson Wyrick
United States Magistrate Judge